# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **CARRIE JOHNSON,** | : | |
| | : | **Case No. 2:10-CV-00076** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | |
| **THE WASHINGTON COUNTY** | : | **Magistrate Judge Mark R. Abel** |
| **CAREER CENTER,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

## I. INTRODUCTION

This matter is before the Court on Defendant Washington County Career Center's Motion for Summary Judgment (the "Motion").  (Doc. 63).  Plaintiff, Carrie Johnson, brings this action to recover for alleged violations of the Americans with Disabilities Act and the Rehabilitation Act, relating to her termination from the Defendant's Surgery Technologist training program. Defendant moves for summary judgment on all remaining claims.  For the reasons set forth herein, the Motion is **DENIED**.

## II. PROCEDURAL POSTURE

Plaintiff filed this action on January 26, 2010, against Defendant Washington County Career Center ("WCCC") and its employee, Dewayne Poling, in his official capacity as Direct of Adult Technical Training at WCCC.  (Doc. 2, ¶¶ 1-3).  In her Complaint, Plaintiff alleged violations of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"), the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* ("RHA"), retaliation for engaging in protected

activity – that is, retaliation for filing a discrimination lawsuit against Defendants in 2008[1] – and violations of Ohio disability law.  (Doc. 2, ¶¶ 26-49, Counts I-V).

On June 22, 2010, the Court granted Defendant Poling's Motion to Dismiss Counts I, II, III, and V of the Complaint against him.  (Doc. 13).  Plaintiff sought to amend her Complaint, on December 20, 2011 (Doc. 26), but was denied leave by the Court (Doc. 32).  On March 12, 2012, the Court granted Defendants' motion (Doc. 25) and dismissed the state law claims, Counts IV and V, against both Defendants (Doc. 33), and entered a judgment in favor of Poling (Doc. 34).

Defendant WCCC now moves for summary judgment on the remaining claims:  Counts I, II, and III.  (Doc. 63).  Oral argument was held on November 6, 2013, and the matter has been fully briefed and is ripe for review.

### III. STATEMENT OF FACTS
#### A.  Background

Plaintiff Carrie Johnson first enrolled in Defendant WCCC's classes in 2008, when she registered for Defendant's Surgical Technologist Program (the "Program").  Plaintiff suffers from a dyslexic learning disability involving reading and comprehension.  Therefore, at her enrollment, she met with representatives of Defendant, including then-Director of Adult Education for Medical Programs, Constance Bennett, to discuss her disability and inquire about certain accommodations that Defendant could provide.  (*Johnson Aff.*, Doc. 66, ¶ 2; *Bennett Aff.*,

---

[1] Plaintiff's first suit against WCCC, alleging violations of the ADA and RHA, was filed on May 27, 2008.  *See Johnson v. Washington Cnty Career Center*, No. 2:08-cv-00515 (S.D. Ohio).  In that case, the Court granted summary judgment in favor of WCCC, on August 2, 2010.  (*Johnson*, No. 2:08-cv-00515, Doc. 35).  On appeal, the Court of Appeals reversed, and remanded the case for further proceedings.  *Johnson v. Washington Cnty Career Center*, 470 F. App'x 433 (6th Cir. 2012) ("*Johnson I*").  The case remains pending before this Court.

Doc. 65-20, ¶ 19). WCCC representatives stated that they would accommodate Plaintiff's disability. (*Johnson Aff.*, ¶ 3; *Bennett Aff.*, ¶ 20).

Plaintiff began classes on February 27, 2008. Almost immediately afterward, Defendant Dewayne Poling, Director of Adult Technical Training at WCCC, argued with Bennett over Plaintiff's enrollment, at which time Poling stated that WCCC "did not have the time to spend for just one student." (*Bennett Aff.*, ¶ 23). The day after this conversation, Poling informed Bennett that he was recommending to the Board of Education that her contract not be renewed. (*Id.*, ¶ 26).

At the same time, Poling informed Plaintiff that her prior education would not apply to the Program, and thus she could not continue at WCCC. (*Johnson Aff.*, ¶ 9; *Letter from WCCC, March 4, 2008*, Ex. 66-3). On March 11, 2008, Plaintiff appealed her removal before the Board of Education, where she argued that she was being discriminated against on account of her disability. (*Id.*, ¶¶ 15-16; *Statement of Carrie Johnson to Board of Education*, Doc. 66-6). Plaintiff won her appeal and was reinstated. (*Johnson Aff.*, ¶ 17).

In March 2008, Plaintiff suffered medical problems requiring hospitalization, resulting in her missing a number of classes. (*Id.*, ¶¶ 19-24). Because of these missed classes, Poling informed Plaintiff, in early April 2008, that she would be removed from the 2008 Program. (*Id.*, ¶ 31; *Email Chain between Johnson and Poling, April 11-17, 2008*, Doc. 66-11). On May 27, 2008, Plaintiff filed suit, alleging that WCCC had violated the ADA and RHA by failing to accommodate her disability and dismissing her from the 2008 Program. (*Johnson Aff.*, ¶ 26). That suit remains pending.

## B.  Plaintiff's 2009 Enrollment

In December 2008, Plaintiff applied for and was admitted into Defendant's 2009
Program.  (*Johnson Aff.*, ¶ 38.  At this time, the application deadline for joining the 2009
Program had already passed, and a waiting list of applicants had accumulated; Defendant
admitted Plaintiff in spite of these hurdles.  (*Binegar Aff.*, Doc. 63-1, ¶¶ 3-4).

During Plaintiff's enrollment in the Program, Defendant Poling engaged in behavior to
which Plaintiff objects:  he met with Plaintiff in public places, in front of other students, at times
that disrupted Plaintiff's classroom activities (*Johnson Aff.*, ¶¶ 45, 46, 54, 63, 70, 109); he
demanded extensive and duplicative documentation of Plaintiff's disability (*id.*, ¶¶ 51-53, 63, 69,
88, 116, 118, 122-24, 126); he requested a blanket medical release from Plaintiff regarding
disclosure of her medical records, and pressured her to sign it (*id.*, ¶¶ 46-50, 90, 92, 109-112,
126; *Letter from Attorney Knoll to WCCC, February 10, 2009*, Doc. 65-2).

On February 26, 2009, Plaintiff provided Defendant with full documentation of her
disability, including:  (a) a psychological evaluation of Dr. Miller; (b) a letter from Vocational
Rehabilitation Counselor Barbara Wilson, from the Bureau of Vocational Rehabilitation
("BVR"), explaining Plaintiff's disability and requesting certain accommodations; and (c) a
handwritten note from Dr. Miller, stating that he had diagnosed Plaintiff with a learning
disability, and concurring with the accommodations listed in the letter from Wilson.  (*Id.*, ¶ 166;
*Signed witness statement regarding delivery of documents*, Doc. 66-32).

Defendant's Surgical Technologist Program is a purchased curriculum acquired from an
accrediting body.  (*Binegar Aff.*, ¶ 25).  Thus, in order for WCCC students to receive

4

accreditation for their degrees, WCCC was required to meet the accrediting body's standards. (*Id.*).  Plaintiff enrolled in several courses as part of the Program; most central to this case, however, was the Medical Terminology class, taught by Patricia Petit.  This course was required for Program students.  (*Binegar Aff.*, ¶¶ 14, 20).  All students enrolled in WCCC courses, including as part of the Program, were required to achieve a grade of at least 70% in order to continue in their program of study.  (*Id.*, ¶ 20).  Plaintiff ultimately failed to achieve at least a 70% in her Medical Terminology course, resulting in her removal.  (*Id.*, ¶¶ 21-23, 29, 40).

## C.  Plaintiff's Requested Accommodations

Plaintiff met with Poling and Program Coordinator Lori Sayre on January 7, 2009, when she began participating in the Program.  At this meeting, she requested the following accommodations:  (a) extended time to take tests; (b) a Kurzweil Reader[2] ("Reader") to use while taking tests; (c) scanning of course materials, including books and papers, into the Reader; and (d) a word bank to use on tests.  (*Johnson Aff.*, ¶ 58; *Transcript of tape-recorded conversation*, Doc. 66-12, at 9-10).  In Plaintiff's opinion, the word bank was necessary because the Reader would not read certain words properly, especially complicated medical terminology. (*Johnson Aff.*, ¶ 58).  Poling and Sayre agreed to scan Plaintiff's books and tests, and to provide a word bank.  (*Transcript*, Doc. 66-12, at 14-16, 17, 19, 24).  At this meeting, Poling expressed some concern about Plaintiff's ability to meet the requirements of the Program.  (*Johnson Aff.*, ¶¶ 57, 68; *Transcript*, Doc. 66-12, at 11-13).

---

[2] Though neither party has explained to the Court the precise nature of a "Kurzweil Reader," the Court understands it to be a device which can scan and recognize text printed on a document, book, or other source, and speak the text aloud for the benefit of the user.  *See* http://en.wikipedia.org/wiki/Kurzweil_Educational_Systems.

A few days after the meeting, Wilson sent a letter to WCCC on behalf of Plaintiff, formally requesting the same accommodations that Plaintiff requested at the January 7 meeting. (*Letter from Wilson to Poling*, Doc 66-18). In addition, Wilson further requested copies of teachers' notes, "if available." (*Id.*).

The parties do not dispute that Plaintiff received extra time to take her tests (Plaintiff's first requested accommodation). Nor do the parties dispute that copies of teachers' notes (Plaintiff's fifth requested accommodation) were generally unavailable, and therefore not provided. (*Binegar Aff.*, ¶¶ 13, 14). The parties also agree that Plaintiff never requested the assistance of a live reader as an accommodation, (*Plaintiff's Response*, Doc. 65, at 39 n.9), despite the fact that Plaintiff had, in other situations, requested live readers as an accommodation for her disability. (*Johnson Dep.*, Doc. 43-1, at 16-18).

### 1. Availability and Functionality of the Reader

Although Plaintiff was provided with access to the Reader, Plaintiff alleges that the Reader would not interpret medical terminology correctly, given the complexity of the vocabulary. At her initial meeting with Poling and Sayre, Plaintiff explained this problem. (*Johnson Aff.*, ¶58; *Transcript*, Doc. 66-12, at 9-10). Plaintiff specifically described to Poling and Sayre the fact that the Reader frequently would fail to "say the right word, especially when you get in the medical or science field, and the words are larger, and some of them, they don't pronounce them right." (*Transcript*, Doc. 66-12, at 9-10). In addition, throughout Winter Quarter 2009, Plaintiff also informed WCCC Information Technology Expert Jerry Bradford, Night Supervisor Liz Pickrell, and instructor Debbie Cline that, during her use of it, the Reader

6

"never read the medical terminology properly." (*Johnson Aff.*, ¶¶ 58, 101-103).  When Plaintiff

asked for test proctors to read her tests aloud to her, however, she was told that such action was

not permitted.  (*Id.*, ¶ 103).

In addition to the Reader's shortcomings, Plaintiff also expressed concern over her access

to the Reader.  In an email to Poling on February 3, 2009, and in a letter from her counsel on

February 10, Plaintiff alerted Defendant to the fact that she was not able to access the Reader

each day until 2:45 pm, because of where it was located.  (*Letter from Knoll to Williams,*

*February 10, 2009*, Doc. 65-2).  Plaintiff also informed Sayre about her inability to access the

Reader until 2:45, in an email dated February 18, 2009.  (*Email chain between Johnson and*

*Sayre, February 18, 2009*, Doc. 66-24).  On February 18, Defendant relocated the Reader.

(*Johnson Aff.*, ¶ 139).  Plaintiff complained that the new room did not have internet access,

which was critical for her because she used an online manual to aid her in her use of the Reader.

(*Id.*, ¶ 152, 169; *Email chain between Johnson and Poling, February 23-24, 2009*, Doc. 66-28).

Finally, Plaintiff had difficulties using the Reader.  Several times, the Reader

malfunctioned and Plaintiff lost the pages she had scanned.  (*Johnson Aff.*, ¶¶ 129, 148).

Plaintiff reported these problems to Bradford and Poling, and asked for assistance in recovering

her lost work.  (*Id.*, ¶¶ 149, 150; *Email Chain between Johnson, Poling, and Bradford, February*

*23-24, 2009*, Doc. 66-27).

In response to all of Plaintiff's complaints regarding the Reader, Bradford notified

Plaintiff on February 24, 2009, that he had taken the following steps:  (1) moved the Reader

computer closer to the front office, which allowed Plaintiff increased access to the Reader; (2)

copied all of Plaintiff's previous files from the network onto the Reader computer, so that

Plaintiff could have access to them; (3) ran a full diagnostic of the Reader computer; (4) performed a disk cleanup and defragmentation; (5) recommended that Plaintiff save her pages individually, to avoid any lost data.  (*Johnson Aff.*, ¶ 158; *Email Chain*, Doc. 66-27).  The new location of the Reader again lacked internet access.  (*Johnson Aff.*, ¶ 157).

Even in the new location of the Reader, Plaintiff's use of the device continued to suffer from frequent interruptions:  three meetings were held in the room on the week of March 2, 2009; one was held on March 10; another on March 11; another was held on March 24; another on March 26.  (*Id.*, ¶ 158).

### 2.   Scanning of Class Materials

At the beginning of her enrollment, Plaintiff was given conflicting information regarding whether WCCC would scan her books and classroom materials into the Reader.  On January 7, 2009, Plaintiff provided her books to Poling and Sayre for scanning, at their direction.  (*Johnson Aff.*, ¶¶ 59-60; *Transcript*, Doc. 66-12, at 14-15, 17, 19, 24).  On January 8, however, Plaintiff's books were returned to her, and Plaintiff was informed that Poling would not scan the materials.  (*Johnson Aff.*, ¶ 76).  On January 10, Binegar left Plaintiff a voicemail asking for the books again.  (*Id.*, ¶ 77).  Plaintiff emailed Binegar on January 11, to inquire further, and Binegar advised Plaintiff to meet with Bradford on January 13 in order to scan the books.  (*Id.*, ¶¶ 78, 80; *Binegar Aff.*, ¶¶ 6-7; *Email from Johnson to Binegar, January 11, 2009*, Doc. 66-15; *Email chain between Binegar and Johnson, January 12, 2009*, Doc. 66-16).  The parties dispute whether this meeting between Plaintiff and Bradford ever took place: Defendant asserts that Plaintiff did not attend the meeting, or attempt to reschedule it (*Bradford Aff.*, Doc. 63-8, ¶ 5); Plaintiff alleges that she met with Bradford throughout the first quarter of 2009, and never missed any scheduled

appointment with him (*Johnson Aff.*, ¶¶ 83-86). Nevertheless, it is clear that Plaintiff met with Bradford several times in early 2009, during which meetings Bradford showed Johnson the location of the Reader, provided her with identification and a password, and discussed issues related to the operation and use of the reader. (*Id.*, ¶¶ 85-86).

During this period, both Bradford and Poling informed Plaintiff that WCCC would not, in fact, scan Plaintiff's materials, since doing so was not in its view a reasonable accommodation. (*Id.*, ¶¶ 86, 87). Thus, Bradford did not scan Plaintiff's materials. (*Id.*, ¶¶ 85-86). Instead, Plaintiff scanned them herself, a time-intensive activity which limited her available time for studying. (*Id.*, ¶ 89). According to Plaintiff, Poling argued that "his staff wasn't there just for [Plaintiff]," and therefore she would have to scan the materials herself. (*Id.*, ¶ 87). Ultimately, in April 2009, Defendant's counsel informed Plaintiff's counsel that Defendant did not view the scanning of materials to be a reasonable accommodation, and would not be providing that service for Plaintiff. (*Letter from Williams to Knoll, April 13, 2009*, Doc. 65-4; *Letter from Williams to Knoll, April 28, 2009*, Doc. 65-7).

### 3. Word Bank

Although Poling and Sayre initially consented to a word bank at Plaintiff's enrollment meeting on January 7, 2009, they informed Plaintiff that evening that WCCC would not provide that accommodation for her medical terminology class. According to Sayre, that choice was made by Superintendent Roger Bartunek. In Sayre's words, Bartunek based his decision on the fact that "it's unfair to the rest of the students, because terminology is all about spelling words correctly." (*Johnson Aff.*, ¶ 65; *Transcript of recorded conversation, January 7, 2009*, Doc. 66-13, at 2-3). In an email dated February 3, 2009, Poling further explained that Bartunek denied

9

the word bank because it was not part of the "customary services in [WCCC's] surgical program." (*Email from Poling to Binegar, February 3, 2009*, Doc. 65-11).  Poling also justified the decision to Plaintiff on the grounds that spelling is a part of "the criteria of the job.  Every job has something more than others." (*Transcript*, Doc. 66-13, at 3).

Lenora Binegar, WCCC's Medical Programs Coordinator, also helped make the decision to deny the word bank.  (*Binegar Dep.* at 47).  In her deposition, Binegar suggested that, as far as she understood, Plaintiff requested a word bank simply because "[s]he wanted it"; Binegar did not know why it was requested, and admitted that she had never asked Plaintiff about it.  (*Id.*). At her July 24, 2012, deposition, Binegar stated that she was "still not aware [Plaintiff] ha[d] a disability." (*Id.* at 18).  Binegar denied the word bank, in her words, because it's "not fair to the other students in the class," and "[n]o medical student would ever be provided a word bank for any reason." (*Id.* at 47).  Because of Plaintiff's disability, Binegar did not believe that Plaintiff "could[] perform the job [of Surgical Technologist]." (*Id.* at 42).

In contrast, Bennett, who taught medical terminology for the 2008 Program, provided all of her students with a "reference material handout[]" that included "a list of important medical terms that would be covered during the course." (*Bennett Aff.*, ¶13).  This list was created before Plaintiff enrolled in the Program, and functioned "essentially [as] a word bank of medical terminology for students." (*Id.*, ¶¶ 13, 17).  Having such a handout, according to Bennett, would "not compromise the integrity of the Medical Terminology course work," because Surgical Technologists "do not chart or otherwise write notes." (*Id.*, ¶ 15).  Thus, "[e]very student received a copy of the medical terminology handout, and every student could use the handout as a resource during examinations." (*Id.*, ¶ 17).

10

### 4. *Plaintiff's Disparate Treatment*

Plaintiff also received different treatment than other students in her Medical Terminology class. Although she turned in her completed tests and quizzes directly to her instructors in her other classes, in Medical Terminology she was required to hand in the assignments to the office, unlike other students. (*Id.*, ¶¶ 130, 131). Plaintiff believed that Patricia Petit, her Medical Terminology instructor, had been grading her tests as she took them; however, no one had been grading the tests, which Plaintiff did not learn until February 18, 2009. (*Id.*, ¶¶ 140, 141; *Petit Dep.*, Doc. 49-4, at 11, 12, 16, 18-20, 30-31). Because of this, Plaintiff did not have her completed and graded tests from which to study before her mid-term examination on February 18, unlike the rest of the class. (*Johnson Aff.*, ¶¶ 131, 132). Normally, students in Medical Terminology reviewed the answers to completed tests and quizzes in class, because the mid-term and final examinations would be combinations of the quiz and test questions. (*Petit Dep.* at 16, 22-23; *Binegar Aff.*, ¶ 15). In an email on February 18, Plaintiff raised this issue with Sayre and Binegar, but she did not receive her graded tests and quizzes until two weeks before the final examination. (*Johnson Aff.*, ¶¶ 135-36, 140-41; *Email Chain*, Doc. 66-24). By this time, the in-class review session for the final exam had already taken place. (*Johnson Aff.*, ¶ 141).

Plaintiff took her final examination for Medical Terminology on March 25, 2009. At this time, Plaintiff's cumulative grade in the course was 61%, making it impossible for her to achieve a final grade of 70% or higher, regardless of her score on the examination. (*Binegar Aff.*, ¶¶15, 17-19). Plaintiff scored a 54% on her final exam, and thus faced removal from the Program. (*Johnson Aff.*, ¶¶ 175-78). She was not provided a word bank for the final. (*Id.*, ¶ 175). Plaintiff was allowed to re-take the final examination on May 7, and again no word bank was provided.

11

(*Id.*, ¶¶ 181, 185).  The format of the "retest" examination was unlike that of the original:
whereas the original examination had 60 multiple choice questions out of 100 total questions,
and only 10 questions of out the 100 where correct spelling was required, the retest examination
had no multiple choice questions, and every question required correct spelling.  (*Id.*, ¶ 187;
*Retest Final Exam, Medical Terminology*, Doc. 66-36).  Plaintiff failed the retest.  (*Retest Final
Exam*, Doc. 66-36).

## IV. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is
appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine issue as to any material fact and
the moving party is entitled to judgment as a matter of law."  A fact is deemed material only if it
"might affect the outcome of the lawsuit under the governing substantive law."  *Wiley v. United
States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
247–48, (1986)).  The nonmoving party must then present "significant probative evidence" to
show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v.
Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir. 1993).  The suggestion of a mere
possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See
Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley
Co.,* 801 F.2d 859, 863 (6th Cir. 1986)).  Summary judgment is inappropriate, however, "if the
dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable
jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251–52).  In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party.  *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).  The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party.  *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir. 1995).

With regard to affidavits, Rule 56(e) requires that affidavits submitted in support of, or in opposition to, motions for summary judgment include facts based on personal knowledge, and that personal knowledge "must be evident from the affidavit."  *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F.Supp.2d 948, 956 (S.D. Ohio 2000).  Affidavits at the summary judgment stage may not rely upon inadmissible hearsay because inadmissible hearsay "cannot create a genuine issue of material fact."  *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 83 (6th Cir. 1997).  Self-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment.  *Wolfe v. Vill. of Brice, Ohio,* 37 F.Supp.2d 1021, 1026 (S.D. Ohio 1999).  See *Anderson*, 477 U.S. at 251; *Copeland*, 57 F.3d 476 at 479.

## V. LAW AND ANALYSIS

Plaintiff asserts three causes of action under federal law.  First, Plaintiff alleges that Defendant violated the ADA by intentionally excluding Plaintiff, by reason of her disability, from participating in and enjoying the benefits of Defendant's services, programs, and activities,

despite the fact that she could have completed the Surgical Technologist Program given reasonable accommodations.  (*Complaint*, Doc. 2, Count I; ¶¶ 26-30).  Next, Plaintiff alleges that Defendant also violated the ADA by "fail[ing] to accommodate her requests for accommodation," *in retaliation* for the filing of her 2008 discrimination lawsuit, a protected activity.  (*Id.* Count II; ¶¶ 31-36).  Finally, Plaintiff alleges that Defendant's exclusionary activities, as alleged in Count I, also violated the RHA.  (*Id.* Count III; ¶¶ 37-41).

### A.  ADA and RHA

The ADA and RHA are "quite similar in purpose and scope," *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997), and "cases construing one statute are instructive in construing the other."  *Andrews v. State of Ohio*, 104 F.3d 803, 807 (6th Cir. 1997).  Indeed, "[t]he analysis of claims under the Americans with Disabilities Act roughly parallels those brought under the Rehabilitation Act."  *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).  It is important to note, however, that the ADA and the RHA are "two laws with two distinct causation standards."  One law, the RHA, "bars differential treatment 'solely by reason of' an individual's disability"; the other, the ADA, requires a lesser showing, and "bars differential treatment 'because of' the individual's disability."  *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 315 (6th Cir. 2012) (en banc).  The "sole-cause standard" is purely a "creature of the Rehabilitation Act"; that heightened standard does not apply to claims under the ADA.  *Id.* at 317.

To establish that dismissal from an academic program constitutes disability discrimination actionable under the ADA, a plaintiff must show that:  "(1) she is handicapped or disabled as defined in each statute, (2) she is 'otherwise qualified' to continue in the program,

14

and (3) she was dismissed from the program on the basis of her handicap or disability."[3] *Johnson I*, 470 F. App'x at 436-37 (quoting *Kaltenberger v. Ohio College of Podiatric Medicine*, 162 F.3d 432, 435 (6th Cir.1998)). When a disabled person can, with reasonable accommodation, meet a program's necessary requirements, that person is "otherwise qualified" to participate. *Kaltenberger*, 162 F.3d at 435. Nevertheless, "'an educational institution [need not] . . . lower or . . . effect substantial modifications of standards to accommodate a handicapped person.'" *Id.* at 436 (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 413 (1979)). Courts should give deference to professional academic judgments concerning reasonable accommodations. *Id.* In addition, as noted above, the ADA's language requiring that a plaintiff show that she was dismissed "because of" or "on the basis of" her disability means that she must show that the discrimination was "a 'but-for' cause of the . . . adverse decision." *Lewis*, 681 F.3d at 321 (internal quotation omitted).

Defendant does not dispute, for the purposes of its Motion, that Plaintiff qualified as "disabled" in 2009. (Doc. 63 at 6). Accordingly, Defendant focuses its attack on the second and third factors: (a) whether Plaintiff was "otherwise qualified," meaning that she could, with reasonable accommodations, meet the Program's requirements; and (b) whether she was dismissed from the Program "because of" her disability, meaning that her disability was a "but for" cause of her dismissal.[4] (*Id.*).

---

[3] The RHA further requires that the Defendant institution is receiving federal financial assistance. *Doe v. Salvation Army in the United States*, 685 F.3d 564, 567 (6th Cir. 2012). This factor is not in dispute.

[4] Defendant addresses Plaintiff's ADA and RHA claims at the same time, and thus argues that Plaintiff's claims should be assessed under the "sole cause" standard. (*See* Doc. 63 at 6, 14-15). As the Court has explained,

### 1. Otherwise Qualified

Defendant argues that because the required 70% grade in the medical terminology course was a neutral, general requirement applicable to all students, and because Plaintiff failed to overcome that hurdle, even with the accommodations that Defendant provided, Plaintiff was not "otherwise qualified" for the Program.

It is undisputed that Plaintiff did not achieve a 70% or higher in the course. Plaintiff asserts, however, that she would have been qualified for the Program, if she had been granted each of her requested accommodations. Defendant admits that some of these accommodations were not granted, on the grounds that they were not reasonable, but argues that Plaintiff' requests were substantially fulfilled, and she still was not able to pass. (Doc. 63 at 10-13). Accordingly, the Court must consider whether there is any genuine dispute, such that a jury could find in favor of the Plaintiff, as to whether, if Defendant had granted all of the *reasonable* accommodations, Plaintiff would have passed the course.

The Court finds that Plaintiff has raised genuine issues of fact as to whether she should have been granted the accommodations she was denied; whether she was granted effective access to the accommodations which were nominally granted; and whether, ultimately, she would have passed the course with the requested accommodations.

First, Plaintiff was denied several requested accommodations, and a jury could find that Defendant should have allowed Plaintiff to use a word bank in her medical terminology course.

---

Defendant is incorrect. This standard applies only to claims under the RHA. Plaintiff's ADA claims must be assessed under a "but for" causation requirement.

16

A document substantially similar to a word bank, which included "a list of important medical terms that would be covered during the course" (*Bennett Aff.*, ¶ 13, 17) was provided to the entire class for use in studying and during test-taking, when Bennett taught the medical terminology course. (*Bennett Aff.*, ¶¶ 13-17). According to Bennett, because Surgical Technologists "do not chart or otherwise write notes," such a handout would "not compromise the integrity of the Medical Terminology course work." (*Id.*, ¶ 15). Moreover, Plaintiff has offered evidence to show that Bartunek and Binegar denied Plaintiff's request for the word bank without considering Plaintiff's disability, or the possibility of accommodating it in a way that would not fundamentally alter the Program or its standards. (*Cf. Email*, Doc. 65-11; *Binegar Dep.* at 18, 42, 47).

In addition, although Defendant provided Plaintiff with a Reader, Defendant took several steps to limit Plaintiff's ability to utilize the device fully, which a jury could find rendered the accommodation meaningless and Defendant's actions discriminatory. Plaintiff repeatedly informed Defendant of the Reader's limitations in handling complex medical terminology from the very start of the term. (*See Letter*, Doc. 65-2; *Transcript*, Doc. 66-12, at 9-10; *Johnson Aff.*, ¶¶ 58, 101-103). She noted her limited access to the Reader, due to its location, and requested that it be moved. (*Email*, Doc. 66-24). Further, Plaintiff asked for internet access while using the Reader, so that she could access an online manual to aid her in using the Reader. (*Email*, Doc. 66-28). Defendant granted some of her requests, and moved the Reader to several different rooms, but continued to limit her access to it, via frequent interruptions (*see Johnson Aff.*, ¶ 158). In addition, Defendant did not assist Plaintiff with scanning her materials into the Reader. Despite Defendant's early promise to assist in scanning Plaintiff's textbooks and classroom

materials (*see Transcript*, Doc. 66-12, at 14-15, 17, 19, 24), Defendant explicitly denied this request (*Johnson Aff.*, ¶¶ 85-89; *Letter*, Doc. 65-4; *Letter*, Doc. 65-7).

Although courts must give substantial deference to academic decisions by educational institutions, *Kaltenberger*, 162 F.3d at 436, that deference "is not absolute, and the Court is tasked with ensuring that the discretion to make academic judgments not be used to mask discrimination."  *Peters v. Univ. of Cincinnati Coll. of Med.*, No. 1:10-CV-906, 2012 WL 3878601, at *7 (S.D. Ohio Sept. 6, 2012).  This is especially true here, where Defendant not only denied several accommodations requested by Plaintiff, but also altered Plaintiff's coursework to her detriment.  Defendant graded Plaintiff's tests and quizzes separately, withholding her completed and graded assignments until two weeks before the final, well after other students have received their graded assignments for use in studying.  (*Johnson Aff.* ¶¶ 130-136, 140-41; *Petit Dep.* at 16; *Binegar Aff.*, ¶ 15).  In so doing, Defendant ignored the cumulative benefit to be gained from studying each graded quiz after the fact.  Moreover, because past tests and quizzes were used to create the final examination (*see Petit Dep.* at 16, 22-23; *Binegar Aff.*, ¶ 15), the fact that Plaintiff did not have her graded tests and quizzes by the time of the final review session (*see Johnson Aff.*, ¶¶ 135-36, 140-41; *Email Chain*, Doc. 66-24) placed her at a further deficit relative to other students in the Program.

In addition, although Defendant allowed Plaintiff to re-take her final examination, Defendant created a new and substantively different final exam on the re-test, upping the difficulty in precisely the area in which Plaintiff experienced the most problems.  (*Johnson Aff.*, ¶¶ 181, 185-87; *Retest Final Exam*, Doc. 66-36).

18

Plaintiff has created a genuine dispute as to whether Defendant's decisions to deny certain accommodations, to limit the effectiveness of others, and to treat Plaintiff differently than other students, caused her to be unable to pass her medical terminology course, and thus whether Plaintiff was not "otherwise qualified" for the Program within the meaning of the ADA.

### 2. Causation

Defendant also disputes that Plaintiff was dismissed from the Program "because of" her disability, under the ADA, or "solely because of" her disability, under the RHA. Defendant argues, instead, that Plaintiff was dismissed because she failed to survive the facially neutral requirement that she receive at least a 70% in her medical terminology course.

The Court finds that summary judgment is not appropriate. As discussed above, Plaintiff has adduced evidence showing a genuine dispute as to whether she would have been successful in her medical terminology course, had she been granted the reasonable accommodations she requested throughout 2009. In light of the fact that several requested accommodations were denied without any stated reasons; that the word bank was denied despite the fact that it was permitted the prior year; that employees of Defendant interrupted and limited Plaintiff's ability to study and use the Reader; that the Reader itself could not properly read medical terminology, a fact of which Defendant was aware from the start of the 2009 Program; that Plaintiff's tests were graded differently and returned to her late; and that her final exam re-test was substantially changed to increase its difficulty for Plaintiff, a reasonable jury could find that Plaintiff would not have been dismissed "but for" her disability.

Moreover, even under the higher "solely because of" standard under the RHA, summary judgment is inappropriate.  Given the above, Plaintiff has created a genuine dispute as to whether her disability was the only reason for her dismissal.  Plaintiff has proffered evidence to show that Defendant could have accommodated her requests, such as providing the word bank, scanning her materials, allowing her fuller access to the Reader, and returning her graded tests and quizzes in a timely manner, without endangering the academic integrity of the Program.  A reasonable jury could find that Plaintiff's disability was the sole reason for her dismissal.

For these reasons, Defendant's Motion for Summary Judgment on Plaintiff's causes of Action under the ADA and RHA is **DENIED**.

## B. Retaliation

Plaintiff's retaliation claim, based on indirect evidence, is assessed under the *McDonnell Douglas* burden-shifting approach.  *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).  The initial burden falls on Plaintiff to present a *prima facie* case of retaliation.  *Id.* at 414.  That requires her to establish that: (1) she engaged in activity protected under the ADA; (2) Defendant knew of this protected activity; (3) Defendant then took adverse action against Plaintiff; and (4) there was a causal connection between the protected activity and the adverse action.  *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013).  The burden of establishing a *prima facie* case in a retaliation action "is not onerous, but one easily met."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Once Plaintiff has carried her burden, she has established a presumption that Defendant retaliated against her, and Defendant must attempt to rebut this presumption by showing that it had a legitimate, non-discriminatory basis for its actions.  *Shelby Cnty.*, 711 F.3d at 697.  If it can

do so, the ultimate burden falls on Plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by [Defendant] were not its true reasons, but were a pretext for" retaliation.  *DiCarlo*, 358 F.3d at 414-15.

The parties do not dispute that Plaintiff's filing of her 2009 is a protected activity under the ADA, and that Defendant was aware of the action.  (*See* Doc. 63 at 16).  Defendant argues, however, that it could not have retaliated against Plaintiff by refusing to accommodate her, because it did, in fact, accommodate all but one of the requested accommodations.  (*Id.* at 16).  Furthermore, Defendant insists that Plaintiff has offered no evidence of a causal connection between her action and any adverse action taken against her.  (*Id.* at 17-18).

Regarding the alleged adverse action, summary judgment is not appropriate.  As discussed above, Plaintiff has raised genuine issues of fact as to whether denial of the word bank was reasonable, given that a similar document was commonly used in prior years, and also as to whether Defendant effectively denied Plaintiff access to the Reader, by limiting her access, frequently interrupting her use, failing to supplement the Reader's inability to read complex medical terminology accurately, despite being aware of this fact, and refusing to assist Plaintiff or scan materials on her behalf.

In order to establish a "causal connection," Plaintiff's burden is again minimal, requiring merely that she "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity."  *Nguyen*, 229 F.3d at 566 (internal quotation omitted).  This evidence must "be sufficient to allow an inference that the adverse action would not have been taken had the plaintiff not engaged in protected activity."  *Shelby Cnty.*, 711 F.3d at 699 (internal quotation omitted).  Temporal proximity can help meet this burden.  And, where the adverse

21

action comes "very close in time" after the exercise of protected activity, "such temporal proximity" can be "significant enough" alone to meet the burden. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Evidence that Defendant treated Plaintiff "differently from similarly situated [students]" is also relevant. *Nguyen*, 299 F.3d at 563.

Plaintiff has produced significant evidence that a reasonable jury could find links her protected conduct with the adverse action against her. Plaintiff has shown that, in 2009, Poling made significant references to "the circumstances" WCCC and Plaintiff were involved in (*Johnson Aff.* ¶¶ 88, 111). Poling also acted to interrupt Plaintiff's ability to access the Reader (*see id.*, ¶¶ 42, 45-46, 54-55, 70-71, 97).

Moreover, Poling's history of discriminatory and threatening statements in 2008, while not the subject of this lawsuit, are relevant to proving discrimination in 2009. *See Hill v. Air Tran Airways*, 416 F. App'x 494, 499 (6th Cir. 2011). In *Hill*, the plaintiff, a former employee, sued his employer for race discrimination and retaliation, alleging, *inter alia*, that he had been terminated in retaliation for his complaints regarding the discriminatory conduct. 416 F. App'x at 498. While noting the value of the temporal proximity in proving causation, the Court of Appeals held that "[e]ven if [plaintiff's] complaints had been removed in time from the date that he was fired," the fact that there was "evidence that they were not far removed from [his manager's] mind when she made the decision to terminate him" could still establish causation. *Id.* at 499. Considering "the circumstances in which [the manager's] comments were made," a jury could infer that the manager had "acted with a retaliatory motive." *Id.* Similarly, even if Poling's comments were made in 2008, a jury could infer that he acted with retaliatory motives in 2009. As in *Hill*, comments made months earlier can still be of value in demonstrating that an

22

employee with decision-making authority was acting in retaliation for Plaintiff's protected action.  *Cf.  Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) ("evidence of a . . . discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment.") (internal quotation omitted).

In addition, Plaintiff was treated differently and worse than her peers.  Other students in past years were able to have access to a word bank (*Bennett Aff.*, ¶¶ 13, 15, 17); other students in Plaintiff's 2009 class received their graded tests and quizzes sooner, allowing them to study in advance of their exams (*Johnson Aff.*, ¶¶ 130-37, 139-42); other students were allowed to ask for assistance during testing (*Johnson Aff.*, ¶¶ 103, 160, 175, 180).  Plaintiff also received a re-test for her final examination that was significantly more difficult than the original examination given to most students in Plaintiff's Medical Terminology course.  (*Johnson Aff.*, ¶¶ 187-89).

Defendant's argument that it could simply have excluded Plaintiff from the 2009 Program altogether (*see* Doc. 63 at 18) is unpersuasive.  Such logic could allow discriminatory actors to insulate themselves from liability by masking their intent to exclude with certain favorable treatment at the outset.  *See Hamilton v. General Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009).  Indeed, Plaintiff has offered evidence that Defendant attempted to do exactly this.  In a January 2009 email chain discussing Plaintiff's enrollment, Binegar noted that "Dewayne [Poling] and Mr. Bartunek [] decided to let Ms. Johnson into the program to prove we were not discriminating against her."  (*Email chain between Binegar and Sayre, January 27 – February 2, 2009*, Doc. 65-12).

23

For these reasons, Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim is **DENIED**.

## VI. CONCLUSION

For the reasons stated above, Plaintiff has raised disputed issues of material fact with respect to her ADA, RHA, and retaliation claims against Defendant.  The Motion for Summary Judgment is hereby **DENIED**.

**IT IS SO ORDERED.**

    **\_\_\_\_s/ Algenon L. Marbley_____**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: November 12, 2013**